[No. 39055.    Department Two.    June 6, 1968.]

TADEK W. OLPINSKI, *Respondent,* v. JOSEPH R. CLEMENT, *Appellant.**

*Horswill, Keller, Rohrback, Waldo & Moren* and *Dwayne A. Richards,* for appellant.

*Bogle, Gates, Dobrin, Wakefield & Long* and *Robert V. Holland,* for respondent.

BRADFORD, J.†—What began as an ordinary, run-of-the-

*Reported in 442 P.2d 260.

†Judge Bradford is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

mill intersection automobile accident has now become deeply involved in the nebulous and highly sensitive area surrounding the interpretation of Rule of Pleading, Practice and Procedure 59.04W, RCW vol. 0. The accident occurred about 3:30 p.m. on November 23, 1962, at the uncontrolled intersection of 26th Avenue West and West Armour Street in Seattle. Olpinski, the plaintiff, was the favored driver, and was proceeding south on 26th Avenue West, and Clement, the defendant, was driving west on West Armour Street. Defendant's vehicle struck plaintiff's vehicle in the left door and rear-quarter panel.

Plaintiff alleged in his complaint that the defendant was negligent in failing to yield the right of way to plaintiff's vehicle. The answer alleged that plaintiff was guilty of contributory negligence, which was a proximate cause of the accident. Plaintiff replied, denying any contributory negligence. The defendant confessed his negligence in his opening statement to the jury and, therefore, the case was tried and submitted to the jury on the issues of contributory negligence and damages only. The jury returned a verdict in favor of the defendant. Plaintiff made a motion for judgment notwithstanding the verdict or for a new trial.

After hearing argument, the court entered an order denying plaintiff's motion for judgment n.o.v., but granted plaintiff's motion for a new trial. The pertinent portion of the order reads as follows:

It is hereby ordered, adjudged and decreed:

. . . .

That the plaintiff's motion for a new trial be and the same hereby is granted for the following reasons:

1. There was no evidence upon which the jury was justified in finding any contributory negligence on the part of the plaintiff.

2. That the jury obviously misinterpreted the facts of the accident since, with the defendant having admitted negligence, the evidence clearly indicated that the plaintiff was free of fault. There was no evidence or reasonable inference from evidence that the plaintiff did not keep a proper lookout as he approached and entered the

intersection. That there was therefore no evidence or reasonable inference from the evidence to justify the verdict.

3. That the jury did not follow the instructions given to them by the court since under the facts of the case as developed at the trial a correct application of the law should have resulted in a verdict for the plaintiff.

4. That substantial justice has not been done in that the relative positions of the cars at time of impact indicates that the plaintiff was free of contributory negligence and that the other evidence likewise indicates.

Defendant commenced a timely appeal and assigns error to the grant of the new trial for the following reasons:

(a) The case did present a jury question as to the contributory negligence on the part of the plaintiff.

(b) Plaintiff took no exceptions to the court's instructions, which included several (including some requested by plaintiff), on the issue of plaintiff's contributory negligence.

(c) Plaintiff made no motion for a directed verdict.

(d) The jury verdict for the defendant constituted substantial justice.

(e) No prejudicial error was committed in the course of trial.

We have searched the record, and we are unable to find sufficient evidence to justify submission of the issue of contributory negligence to the jury. The complete testimony of the plaintiff concerning the accident consists of a portion of the cross-examination:

Q. Mr. Olpinski, how fast were you going at the time of the accident? A. At the time of the accident I was driving in low gear, which I estimate a speed around between eight and ten miles. Q. And you never saw the other car, did you? A. I did not. Q. You glanced down there, but saw nothing, is that correct? A. Yes, I glanced down and saw nothing. It was impossible to see because it is a grade down so it is impossible to see down. Q. You don't know how far you could see there. A. A half block, maybe. Q. And at the time of the accident itself, I take it, you were looking straight ahead. Mr. Holland: If the court please, I thought this issue was out of the case. Mr. Waldo: I have admitted that he was negligent, counsel. The Court: We still have the element of contributory

negligence. Mr. Holland: I see. The Court: All right, you may proceed. A. I glanced to the left, I glanced to the right and I looked ahead. Q. So at the time of the accident you were looking straight ahead, is that correct. A. At the moment of impact? Q. Yes. A. Most likely.

The passenger in plaintiff's vehicle merely corroborated the speed testified to by the plaintiff of not more than 10 miles per hour and that the plaintiff was in low gear. There was no cross-examination of this witness. The defendant testified on direct examination that the plaintiff was on his right and southbound on 26th Avenue West as the defendant was proceeding west on West Armour Street. The following is that portion of the record which could possibly be interpreted as showing contributory negligence. Clement, the defendant, testified:

Q. When you first saw his car where was it? A. Just entering the intersection. Q. Where was your car? A. Just prior to entering the intersection. Q. Did you observe at that time Mr. Olpinski, did you see him? A. Yes, I did. Q. When you first saw him what was he doing? A. He was turned to the right. Q. Did that remain true up to the time of the accident? A. Yes, it did. Q. The car you were driving was damaged in the front end? A. Yes, it was. Q. About what was the extent of the damage? A. About 125. Mr. Waldo: That is all I have. Cross Examination by Mr. Holland: Q. Mr. Clement, you said you did not see the Olpinski car until the impact? A. No, I saw it when it entered the intersection. Q. Did you see the car at all before the collision then was the question you were asked. A. Yes. Q. You did see it. Did you keep your eyes continually on the driver's head while you were approaching and went towards his car? A. No. Q. Were you attempting in some way then to stop your car or avoid the accident? A. Yes. Q. So you would have been looking —you could have been looking elsewhere where you could turn or what you could do? A. I was looking straight ahead. Q. Could you estimate in seconds how long it was between the time you first saw his car and the time you hit it? A. Oh, about two to three seconds. Q. And you have no idea whether Mr. Olpinski looked your direction, at least up to the time you saw him? A. No. Mr. Holland: I have no further questions.

Defendant's passenger testified:

Q. All right, and as the car that Joseph Clement was driving approached this intersection, will you just tell us what you observed? A. Well, I didn't realize there was another car until we were right, just practically on top of it in the intersection; and so this Opel—I believe it was a yellow one, but I am not positive—was directly in front of us. So I braced myself, I got my arms out on the dash, and then we hit the car, the left hand portion of the car on the left side. Our car continued up the hill a ways, and this other car spun around and ended up on the parking strip. Q. At the time you first observed the Opel, how far was the car being driven by Clement? How far were you from it when you first saw it? A. Well, it would seem to me a distance of twenty to thirty feet. Q. And shortly before this happened what would you say about the speed of the car you were in? A. Fifteen to twenty miles an hour. Q. And Armour Street, approaching this intersection, is there a grade or is it level, or what would you say? A. It's a fairly steep hill. Q. And you were going up or down it? A. Up. Q. All right, and is the intersection itself on a grade, or does it level out at the intersection? A. Well, 27th West is level. Q. I see. All right, before the accident will you tell me whether or not you observed the driver of the Opel? A. Yes, I did. Q. What did you observe about the driver, if anything? A. Well, I am positive that he was not looking at our car. Q. Did he ever turn his face or head in your direction? A. Not that I could see. He was looking away from us. . . . Q. How about the other vehicle, as to its speed, what would you say about it? That is, the Opel? A. I doubt that it was going faster than ten or fifteen miles an hour.

On cross-examination, the same witness testified:

Q. I see. At the time you first were aware of this other car at the intersection, would you say that you were already in the intersection or not? A. No. Q. And by that time would you have been into or across the crosswalk that may or may not have been painted? A. We were just on the verge of entering. Q. The intersection? A. Yes. Q. I see, and by that do you mean the front end of your car was about crossing the curb line? A. Either crossing it or within ten or fifteen feet of it. Q. I see, and right at that point—and that is the point where you said you first observed the other car—where was the other car with

reference to the intersection? A. He was in the intersection. Now, I don't know if he was fully in it, but I am sure his car was partially in it. Q. I see. What effort, if any, did you observe that Clement made to avoid the accident, the collision? A. I wasn't in a position to observe any. I just realized we were going to hit him, and I got my hands upon the dash, braced myself. Q. You couldn't tell whether he had time to, or did apply the brakes or not? A. No, I didn't notice. Q. How about the horn? Were you aware of it being sounded by anybody? A. I don't think anybody sounded any horn. Q. Did you have any opportunity, in that short a space, for either one of you to say anything as you came up on the car? A. Possibly sort of a reflex action. I might have said, 'watch out' or 'look out' or something. I don't recall. . . . Q. And would you describe again which part of the other car was struck by your car? A. Yes, it was the left rear door and quarter panel; the rear half of the car, left side.

▪ The evidence is uncontradicted that, as the plaintiff was entering the intersection, he glanced to his left, which was a down grade at that point, he then glanced to his right, and was proceeding through the intersection looking ahead, when his vehicle was struck by the defendant's vehicle in the left rear door and quarter-panel. The plaintiff was entitled to rely on the defendant's yielding the right of way. Even after it becomes apparent to the favored driver that the right of way will not be yielded, a reasonable reaction time must be allotted the favored driver to permit him to act in the exercise of due care. *Golub v. Mantopoli*, 65 Wn.2d 361, 397 P.2d 433 (1964); *Tobias v. Rainwater*, 71 Wn.2d 845, 431 P.2d 156 (1967); *Petersavage v. Bock*, 72 Wn.2d 1, 431 P.2d 603 (1967).

▪ If the jury chose to disbelieve plaintiff's testimony entirely, there was no basis upon which they could find him guilty of contributory negligence, because the defendant's testimony failed to establish plaintiff's contributory negligence. The defendant saw the plaintiff looking to the right as he entered the intersection. The accident occurred not more than two or three seconds later. Defendant's passenger, Mr. Russell, gave testimony more favorable than this

to establish that plaintiff was not contributorily negligent. Defendant has the burden of proof on the issues of his affirmative defense and he failed to present more than a scintilla of evidence. He did not sustain his burden.

We hold, as a matter of law, that there is neither evidence nor reasonable inference from the evidence to justify submitting the issue of contributory negligence to the jury. *Pritchett v. Seattle*, 53 Wn.2d 521, 335 P.2d 31 (1959); *Cooper v. Gallaher*, 50 Wn.2d 588, 313 P.2d 702 (1957).

After both parties had rested, plaintiff failed to move for a directed verdict on liability, nor did he take any exceptions to the court's instructions. The defendant relies very heavily upon *Agranoff v. Morton*, 54 Wn.2d 341, 340 P.2d 811 (1959), which we find is not applicable to the instant case. The cases are very similar from a procedural standpoint, but in the *Agranoff* case, the reasons given by the court in granting a new trial were not borne out by the record.

■ The failure of the plaintiff to challenge in any way the sufficiency of defendant's evidence on contributory negligence or to take exceptions to the court's instructions was precariously close to invited error. We have carefully scrutinized the record and conclude that the record reflects the trial court was correct in the reasons given for granting a new trial, there was no evidence of contributory negligence, and the jury misinterpreted the facts and did not follow the instructions given. This is apparent, since the jury found that plaintiff was contributorily negligent, although there was no evidence to sustain the finding. By so doing, the jury arrived at an erroneous verdict. *Cyrus v. Martin*, 64 Wn.2d 810, 394 P.2d 369 (1964).

■ An order granting or denying a new trial is not to be reversed, except for an abuse of discretion. A much stronger showing is required to reverse an order granting a new trial than is required to reverse an order denying a new trial. *State v. Taylor*, 60 Wn.2d 32, 371 P.2d 617 (1962), and cases cited therein; *Johnson v. Howard*, 45 Wn.2d 433, 275 P.2d 736 (1954); *Nelson v. Martinson*, 52

Wn.2d 684, 328 P.2d 703 (1958); *Baxter v. Greyhound Corp.*, 65 Wn.2d 421, 397 P.2d 857 (1964).

There is no evidence in the record that plaintiff's counsel was speculating upon a favorable verdict or was secretly nurturing an error which might be asserted for the first time on a motion for a new trial.

■ The trial court has the duty to see that justice prevails. He has the power in the exercise of his discretion to grant a new trial where substantial justice has not been done, but, to facilitate appellate review, he must state his reasons. We stated, in *Baxter v. Greyhound Corp., supra* at 440:

> The basic question posed by an order granting a new trial upon this ground, be it a civil or criminal action, is whether the losing party received a fair trial. *State v. Taylor, supra* [60 Wn.2d 32, 371 P.2d 617 (1962)]. And, it is in this area of the new-trial field that the favored position of the trial judge and his sound discretion should be accorded the greatest deference, particularly when it involves the assessment of occurrences during the trial which cannot be made a part of the record, other than through the voice of the trial judge in stating reasons for the action taken.
>
> If the trial judge, in the exercise of his best judgment determines that a fair trial has not been had, he has the alternative, in an appropriate situation, of granting a partial, a conditional, or an unconditional new trial. This decision, in turn, calls for a weighing of factors and values such as the complexity of the issues, the length of the trial, the degree and nature of the prejudicial incidents, the nature and amount of the verdict, the cost of retrial, the probable results, the desirability of concluding litigation, and such other circumstances as may be apropos to the particular situation.

The trial court concluded that substantial justice had not been done and stated his reasons. Upon the basis of the record, we agree. The order granting a new trial is affirmed. Defendant's negligence having been admitted, and there being no evidence of contributory negligence, the order of the trial court is affirmed, and, on retrial, the jury

will be limited to the issue of damages only. Costs will abide the results of the retrial.

FINLEY, C. J., HILL, HUNTER, and NEILL, JJ., concur.